Mr. Clark, call the case. I'm Adam Clark. We're all case 0927, Pete Wilber v. Raymond Jones. Good morning, your honors. Very pleased to report, I'm Jim Morsi from the Office of the State Appellate Defender, representing Raymond Jones, the petitioner appellant. I'm happy to answer questions on any of the four issues raised on appeal, but would like to focus on excessive sentence, which is issue 3, and public trial, which was issue 1. Although excessive sentence was the third issue in the briefs, I'd like to address it first today, because it's a fact-based issue that requires further development, and then address public trial, which is primarily an issue of law. Sentencing relief is warranted in this case, because the court abused its discretion when it disregarded substantial mitigation evidence and imposed the maximum sentence of 75 years, which must be served at 100%, and guarantees that Raymond will never be restored to useful citizenship. The court's own comments in this case show that it failed to consider the mitigation evidence. The court stated that virtually no factor in mitigation comes into play. However, there was a litany of mitigation factors that the court did not consider. First, the court failed to consider Raymond's rehabilitative potential. Raymond was young at the time of this crime. He was only 18 years old. He had a minimal, nonviolent criminal background and expressed interest in continuing his education. These were all factors that this court has found significant in addressing a defendant's rehabilitative potential. Additionally, the court did not consider that Raymond's guilt was premised on accountability for the actions of the gangbangers that actually planned and perpetrated this crime. Was he the armorer for the gangbangers? Is that the idea? Raymond lived on a block controlled by the Latin Dragons. So it's okay to supply gangbangers with guns if you live on a block controlled by the gangbanger? No, Your Honor. That is not what we're saying. Why didn't he hit after it was over, didn't he? All of Raymond's actions, yes, he did. But all of Raymond's actions in this case, there was evidence that they were done under threat of harm at the hands of the gang that controlled his block. His role was that he was bullied to hold the gun for the gang. Did he defend on the defense of compulsion? He did not raise the defense of compulsion. However, it should have been considered in mitigation in addressing his moral culpability for the crime. Are you suggesting that the trial court did not consider the defendant's age when imposing the sentence? It did not, Your Honor. Although the court did say that Raymond was 18 years old, he said that he was not a child. Like the case in People v. Markowitz, although the court reiterates a mitigating factor, his very comments show that he didn't consider it or weigh it in mitigation. Judge, this is where I'm having trouble because I'm seeing this in a lot of cases where the defense attorney says, well, the trial judge didn't consider all the following things in calculating the sentence. And sometimes the judge actually said them. But, you know, age is something that's right in front of them. There's no doubt the judge knew how old this person was, right? Correct. At what point, I mean, what does the judge have to do to make an appropriate record so that we don't have this argument coming up all the time? Well, Your Honor, what did the judge do that you think the judge should have done with respect to articulating how he got to 75 years? Well, the judge should have considered Raymond's rehabilitative potential, which is a significant factor. And these three factors, considering his age, his lack of a nonviolent criminal background, and his interest in continuing his education, are factors to consider. Now, it is presumed that the court does consider proper factors in mitigation, absent some contrary indication on the record. Now, here the court actually said virtually no factor in mitigation comes into play. However, rehabilitative potential is a factor that should have been considered by the court. Now, additionally, although I addressed before that his guilt was . . . Well, maybe the court considered it and determined he didn't have any rehabilitative potential. Well, what I'm saying, Your Honor, I'm sorry, is that being of a young age, having a nonviolent criminal background, and expressing his interest in continuing his education are factors that this court has said a court should consider in addressing a defendant's rehabilitative potential. This crime is not the theft of a bicycle. A 10-year-old girl is dead because of their behavior. So you're telling me that, well, that's okay, but we can rehabilitate him. Well, that's only one potential factor in mitigation that the court failed to consider. Additionally, Your Honor, there's evidence that all of Raymond's actions in this case were undertaken under threat of violence by the gang that controlled this block. Raymond was not a gang member, but he lived in a neighborhood, as the State has described it, infested, literally infested, with gangbangers. He lived on 87th and Escanaba, which was controlled by the Latin Dragons. One block over was controlled by the Latin Kings. He lived in the middle of this gang war. He took the gun and held it on the orders of a high-ranking gang member that lived across the street from him under threat. He gave the gun to Louis Pena, who was the actual shooter in this case, at the command of Antoine Lacy, who was the first in command of the Latin Dragons and had bodies under his belt. His role on this block was to hold this gun under threat of violence at the hands of this gang. Additionally, Your Honor, the court failed to consider Raymond's terrible social environment at home. Raymond's mom suffered from depression, and his dad was addicted to drugs and alcohol and had set fire to the house that they had lived in on three separate occasions. As a result, Raymond suffered from post-traumatic stress disorder. This terrible social environment is something the court has also considered significant in people v. Margentina and has also reduced a defendant's sentence based on that factor. Another significant factor, Your Honor, that the court affirmatively did not consider was that Raymond was mentally retarded, as that term is defined for purposes of sentencing. For purposes of sentencing, mentally retarded is defined as sub-average general intellectual functioning, generally originating during the developmental period and associated with impairment in an adaptative behavior reflected in delayed maturation or reduced learning ability or inadequate social adjustment. On that issue, are we relying only on the number, 75 or 72 or whatever it might be? Not necessarily, Your Honor. Here, the very definition of mentally retarded, for purposes of sentencing, is sub-average general intellectual functioning. But then we have Dr. Echevarria, right, who interviewed him for something like eight hours, I thought, and watched the video, and obviously that wasn't played before the whole jury, right? Correct. All right. But do we have another doctor with a conflicting opinion somewhere here? We don't, and these psychologists did determine that he was not mentally retarded for purposes of psychological assessment. However, that's not how the term is defined for purposes of sentencing. Here, the undisputed evidence showed that Raymond had an IQ of 77. This is in the bottom sixth percentile of the population, meaning 94% of people would score higher. Additionally, he had a verbal IQ of 68, which is in the extremely low range, bottom second percentile. And there's also a chance that his IQ is as low as 73. In addition to this, Raymond had been enrolled in therapeutic schools for children with learning disabilities and autism and had about second grade reading level. Clearly, for purposes of sentencing, he had a sub-average general intellectual functioning. And are you then suggesting that if someone tests low on an IQ test, then they get a lower sentence? It's something to definitely- Or what's the remedy? Well, it's certainly something that the court should have considered in determining Jones' moral culpability for this crime and assessing the proper sentence. Here, the court said that Jones is not some borderline person who is mentally retarded. No, he's above borderline. However, the undisputed evidence was that he had borderline intellectual functioning and sub-average general intelligence. And clearly, he was maybe a bit more malleable at the hands of these gang members who threatened him with violence. Now, weighed against all these factors, the court considered that Mr. Jones initially provided the police with misleading information. However, this only misled the investigation for a very brief period of time. And when he was confronted with conflicting information, he immediately confessed and told them where the gun was. The judge also considered that Mr. Jones took the gun back after the shooting. But as I said, all of Mr. Jones' actions were basically, or there was evidence that they were performed under the threat of violence at the hands of the gang that controlled his block. From looking at the record, it seems that a major precipitating factor for the size of this sentence was that your client misdirected the investigators and, you know, had enough savviness to do that. Can you comment on that a little bit? Yes, Your Honor. He did initially provide the police with misleading information. However, again, that only misled the investigation for a very brief period of time, I think only a few hours. And when he was confronted later with conflicting information, he immediately confessed. And when that's weighed against this litany of mitigating factors that the court clearly didn't consider, it should weigh in favor of finding that he was less morally culpable for the crime and did not deserve the maximum sentence of 75 years, which is actually the longest sentence of any of the co-defendants in this case, longer than the gangbangers that planned and actually perpetrated this crime. So in conclusion, Your Honors, the court abused its discretion when it imposed the maximum sentence of 75 years on Raymond without considering the substantial mitigation evidence or his rehabilitative potential. Therefore, this court should exercise its power under Supreme Court Rule 615 and reduce Raymond's sentence to 35 years, at which point he'll be 53 years old when he is released from prison. All right, let me ask you about the voir dire issue, because I'm sure you're running close on your time. You had a situation here where you had three juries sitting simultaneously. It looks like the solution in 26 and Cal was to split the voir dire up among three different judges. Correct. So you've got Judge Stevenson doing this voir dire. I have a feeling without watching the video of the thing, which we don't have, of course, you know, it was a little bit chaotic and frenetic, and judges were moving around to different rooms. And you make an argument about the public trial and the fact that three jurors were questioned partially in the seclusion of the judges' chambers. But don't we have sidebars all the time? I mean, where do we draw the line? I mean, this is not an issue I've ever seen before. Correct. But how does this differ from every other trial where we may haul a juror into chambers or do a sidebar with them? Well, Your Honor, the Sixth Amendment right to a public trial does not apply to sidebars. However, it unquestionably does apply to voir dire. And this was voir dire in this case. They were questioning Cook and Medrano in chambers to determine their ability to sit the case. How do you reconcile that theory with Peoples v. Cloutier? It says the sequester of voir dire is a matter within the discretion of the trial court. Where did he abuse his discretion? This was not sequestered voir dire in this case. This was closed proceedings. It was sequestered voir dire for three jurors, at least a portion of it. No, Your Honor. Our position is that this was not sequestered voir dire. And actually the cases cited by the state show that sequestered voir dire does not necessarily take place in chambers, a room that's not accessible by the public. In fact, in Peoples v. Williams, a case cited by the state, the court says that the sequestered voir dire was to take place in another courtroom, not in chambers. What difference does the room make? The difference the room makes is because the chambers is a room not accessible by the public. It's closed to the public. If voir dire is sequestered, it means no one gets in. It's done outside the view of the public. Sequestered voir dire in the cases cited by the state show that sequestered voir dire takes place outside of the rest of the voir dire, not necessarily out of the view of the rest of the public. Does it anywhere in those cases suggest that a court cannot question jurors in the presence of the defendant, in the presence of the defendant's attorney, in his chambers? Give me your best case. Yes, Your Honor. The Supreme Court cases, United States Supreme Court cases in Waller and Presley, show that when there is a closure of the court on the court's initiative and there's in-camera questioning of two jurors, as we had in this case, where there's no findings of why that's necessary, then it's a closure of the court. Whoa, whoa, whoa, wait a minute. Who says it wasn't necessary? You could have gotten a run on this panel based on the answers all three of these people gave to questions that were made in open court. Anybody who's ever tried a jury trial knows that if one member of the panel comes up with an excuse as to why he can't sit and the other members of the array hear it, all of a sudden five of them have the same excuse. So it's commonplace for the judge to take a juror who has answered a question that could be difficult, remove that juror, and finish the voir dire in chambers, in the presence of the defendant and in the presence of the defense attorney. And I have never heard this argument before by anyone. Just to clarify, Your Honor, we're not challenging the questioning of Ms. Pater because she actually asked to be questioned in private. It's only the questioning of Mr. Cook and Mr. Medrano. And second, then if the court found that it was necessary to question a person in order to prevent the contamination of the rest of the panel, then it should have made those findings on the record in open court. What does it say has to make the findings? The Supreme Court's decision in People v. Waller, People v. Presley, and also the Seventh Circuit's decision. It says it has to be a reason. It says it has to articulate the reason on the record in court. The reason, you know, unfortunately I'm a former trial judge. The reason is apparent on the record. It's absolutely apparent why Cook and Medrano were questioned outside the presence of the array. Your Honor, the court did not articulate its basis for closing the court. Excuse me. Second of all, your defendant was present while this was going on, and so was his attorney. There wasn't a single objection by either. That to me is forfeiture. He had an obligation to raise it. He could have raised it. He didn't raise it. In criminal law, we abhor forfeiture, but tell me why this isn't forfeited. For three reasons, Your Honor. First, because there is a presumption of openness of the trial court, and the court closed on the initiative of the trial court. The burden was on the trial court to identify an overriding interest justifying closure and consider alternatives to that closure. The court did not do so here. What did the United States Supreme Court say in Waller about waiving objections to public trials by failing to object during the course of the trial? What did they say? The court said it's possible that it could be. However, later decisions have established that the right to a public trial is unquestionably a fundamental trial right that is not subject to forcing. You don't think the U.S. Supreme Court understood that when they decided Waller? Well, subsequent decisions in People v. Presley and decisions of the circuit courts in Walton v. Briley and the second district actually in dissent in Downs v. Laft have decided that the right to a public trial is a fundamental trial right that must be knowingly and voluntarily waived. So the right to a public trial is like the right to a jury trial. So although there might be silent acquiescence to a bench trial, that's insufficient to find a knowing involuntary waiver of the fundamental right to a jury trial. So silent acquiescence to closure initiated by the court is insufficient to find a waiver of the fundamental right to a public trial, Your Honors. And third, even if this Court does find that this issue is forfeited, the right to a public trial is a structural right. That's even been acknowledged by the State in their brief. And under the second prong of plain error, when there's error affecting a structural right, that necessarily requires reversal under the second prong. And additionally, Your Honor, I'd just like to point out that Raymond does not need to show any prejudice or in this right is not subject to harmless error. And as this Court has said, the remedy for this, for, excuse me, the Sixth Amendment protects all portions of the trial, including voir dire, and the appropriate remedy for improper closure is a new trial. And I'd like to reserve whatever time remaining for rebuttal. Thank you, Your Honor. Thank you. Counsel? Why don't you address the last issue first? I'm sorry. Address the last issue first? Certainly. For the record, Assistant State's Attorney Peter Maltese, on behalf of the people, defendant's arguments regarding sentencing is completely contrary to the record. No, no. The last issue was? Oh, the last issue he addressed. Defendant's right to a public trial was not at all implicated by the trial court's questioning of the two potential jurors in chambers. Each and every case that defendant rests upon, there was either a complete closure of court proceedings or an overt exclusion of someone from the courthouse, from the courtroom. In this case, there's certainly no evidence that anybody was excluded. The Court's actions in this case? I mean, we've got to assume there might have been an audience there that didn't all traipse into the judge's chambers, though, can't we? Well, that's an assumption that's based on nothing on the record. There's nothing showing that there was anybody in that courtroom. Well, how about the rest of the array? They were in that courtroom, weren't they? They were in chambers. Well, they certainly were in chambers. That's why they were brought in. They were brought in chambers. The rest of the array was in the courtroom. And that, in fact, is the reason why Judge Stevenson brought the two potential jurors? I know why he brought them in. But your argument was there's no way for us to assume that there was anybody in the courtroom. There certainly was, the rest of the array. And they're members of the public, aren't they, until they're sworn? That's correct. But clearly the members of the veneer does not have a right to hear every single question of a potential juror, in fact, because of the risk that they might be polluted, or as Your Honor mentioned. I understand why he brought them in chambers. Now the question becomes, is it a discretionary matter on his part, or is it not? It's a discretionary matter. And what's your best case that stands for that proposition? People v. Williams, which counsel mentioned. In that case, although the court had planned on bringing the potential jurors into another courtroom, there was no courtroom available. But also in that case, both defense counsel and the court mentioned the fact that they considered several alternatives, which one can assume. One of the alternatives is chambers. And ultimately, although not explicit in the record, in the case, the case indicates that there was some security concerns. And there's nothing in Williams to show that the reason why the court did not bring them into chambers was the fact that there would be a violation of the defendant's right to a public trial. As Your Honor mentioned, it's very similar to a sidebar or to a jury instruction conference,  There is simply no closure, such as the Supreme Court cases, which defendant rests upon. This is a completely different situation. Additionally, this court itself ruled in people v. Lane and in people v. Webb, that even if there was a public trial violation, it could easily be waived by defense counsel. And Your Honor has mentioned Waived or forfeited? In this case, we would argue it was in fact waived and not forfeited. Counsel and defendant did not sit silently. They participated. Counsel, of course, participated in discussions in chambers. It's more than just a silent act of defense. Well, the defendant was there, too. The defendant was there, too. And I might add, it was fully transcribed. In Press v. Enterprise, the press was barred from three days of void error and was denied transcripts. In this case, everything that occurred was transcribed. There was simply no violation of defendant's right to a public trial in this case. You know, the distinction between forfeiture and waiver is not really a distinction in the age of these cases. We have come in modern times, within the last five years, to understand that this is forfeiture we're speaking of, not waiver. Waiver is a voluntary relinquishment of a known right. Prior to Justice Steigman's opinions, where he pointed it out and the Supreme Court finally accepted it, we used to refer to all of this as waiver. And it really wasn't waiver because there was no affirmative acknowledgement of a waiver of a right. It was forfeiture. It always has been forfeiture. But I'm interested in the U.S. Supreme Court's decision in Waller when they say that the right to a public trial can be waived if there is no objection. Exactly. In this case, there was no objection. In fact, the defense got the benefit of this procedure by having the jurors be excused and having it done outside the presence of the rest of the veneer. The trial courts have traditionally enjoyed wide discretion in voir dire and for good reason. The trial court requires unfettered control over a courtroom full of members of the general public and perhaps members of a defendant's family and friends. And this court should not take away this discretion. Defendants' arguments are completely unsupported by case law. Well, they do have a case. They have the Washington Supreme Court case. Do they not? That's been rejected by Mississippi and Missouri and Maryland already? That's correct. And that was decided based on the state constitution. And a completely different factual scenario in that it wasn't just three people who went into chambers based on the court's decision that that was required. There's ten jurors questioned in chambers and that the court made multiple invitations to the entire veneer that if anybody wants to go in chambers, we'll go in chambers. And also, again, based on the state constitutional, prejudice was presumed. I might also add in that case, the Washington State Supreme Court mentioned that the procedure was unclear on exactly what the court was following in that case. In this case, Judge Stevenson's procedure was clear on the record. And as Justice Hoffman suggested, the record is clear on the reasons why she did that. There was simply no closure in this case. And defendants' right to a public trial was not at all implicated. Mr. Motese, let me segue to the other issue, which is the 75-year sentence. It's particularly interesting here because we have two other defendants with considerably lower sentences, right? That's not entirely correct. Two other defendants got the maximum 60 years. But in those cases, the jury did not find the firearm enhancement. And that's why, in this case, the defendant's jury did find the firearm enhancement, and that's why he had 50 more years. I'm probably thinking of the fourth person involved, who was the one who voluntarily testified. Yes, and he pleaded guilty. That part makes sense. But, you know, we've got a 17-year-old who's borderline, you know, IQ issues, and we're doing a 75-year sentence on him. And I realize that the facts of the case are particularly heart-wrenching. But at some point we had to sort of look at, aren't there a lot more heinous crimes where the person might have been plotting it rather than simply passing a gun along and acting like a teenager, which is sort of what we have here. This is what's giving me... Respectfully, I have to disagree with your characterization that most teenagers don't hide guns, bring them out for them to be shot, bring them back to the house to be hidden. I only mean that in the sense of I'm going to go along with my peer group and participate in something. I don't mean that the person doesn't realize his actions. That's why we have juvenile court. I would argue that he realized the gravity of the situation, and that's why he approached the homicide detectives and gave them false information. And there's not one piece of evidence to support that he was under threat of violence to take that action. Whether or not he was under threat of violence in order to take the gun and hide the gun, the record is actually ambiguous on that. But there's nothing to support anything other than the fact that he voluntarily misled those detectives. And the fact that they were misled for only a couple hours is really irrelevant to his culpability in this case. Because it just so happened that one of the other defendants came clean and gave the police the correct information. And that's the only reason why this investigation went back on track. And as I began to stay at the start of the argument, defendants' arguments regarding sentencing is completely contrary to the record. Because in this case, Judge Wattis expressly enumerated each and every mitigation factor and stated that they don't apply. And found regarding his alleged intellectual disability, which is how it's defined now in the statute, that he was in fact functioning based on his actions. And intellectually disabled, which originally was mental retardation, is defined in Section 5-1-13. And it talks in terms of sub-average intellectual functioning. And that's exactly the analysis that Judge Wattis did in this case. He looked at his functionality in misdirecting seasoned homicide detectives and putting them off the track. And the IQ number, first of all, is not mental retardation in this case. It was 77. And one of the experts, Dr. New, who did two reports which Dr. Escobaras reviewed, stated that he believed that defendant's IQ should actually be higher. And that he actually wasn't trying hard enough in this case. The record supports the case that this defendant is a manipulator. He attempted to manipulate the police. He attempted to manipulate the expert witnesses. And the judge took all this into consideration and found that that was sufficient and significant aggravation. How does the record demonstrate that he tried to manipulate the expert witness? Are you talking about Dr. Echevarria? I'm sorry, not the expert witness, but Dr. New, who actually testified for the defense during the trial. And the fact that he wasn't trying hard. Dr. New mentioned in his report that he thought that defendant, while he didn't know the answers to certain questions, such as one of the questions was who is Martin Luther King, Dr. New followed up with, well, is there anything you know? Is there a single fact you could know? And he just would shut down and say, no, there's nothing I could mention. And it was Dr. New's opinion that he, in fact, was not trying hard enough. Defendant's actions was just as culpable as his co-defendant who shot the gun in this case. He supplied the gun, he hid the gun, he put the police off the record. Defendant's sentence was completely supported by his actions in this case. He was found guilty after a fair trial. He was sentenced after a fair and complete sentencing hearing. For these reasons, and the reasons stated in the people's brief, this court should affirm defendant's conviction and defendant's sentence. Counsel, thank you. Rebella? Yes, Your Honor. First on the issue of public trial, based on the Supreme Court's reasoning in press enterprises, this was a closure of the court. In press enterprises, the court said that when a juror asks to be questioned in private because of a sensitive nature of a question, the court can close proceedings and continue, quote, in camera but with counsel present and on the record. Here, the court closed proceedings and continued in camera but with counsel present and on the record. Just because it was transcribed does not mean it was a closed proceeding. Second, the Washington Supreme Court case was cited as an example of where the court found that there was just a closure, where there was questioning of jurors in chambers but on the record, not for the total analysis of that case. It hasn't found too many courts agree with this, though, does it? Well, like I said, Your Honor, the United States Supreme Court reasoning in press enterprises, where they say that the court can close proceedings when there is an interest, and then those closed proceedings are continued in camera but with counsel present and on the record. Additionally, the suggestion by the State that there was some overriding interest that the court considered in closing, the court is not on the record. And this is exactly the type of post hoc justifications condemned by the Supreme Court in Waller. Next, Your Honor, on the issue of whether this is a sidebar or jury instructions, the court has held that the Sixth Amendment right to a public trial does not apply to sidebars or jury instructions, but it does unequivocally apply to voir dire. Additionally, the State cited to Lane for the proposition that it can be forfeited. However, for that proposition, Lane relied on a U.S. Supreme Court U.S. v. Labine, which was decided under the Fifth Amendment due process clause, not the Sixth Amendment. And in people v. Webb, there was an affirmative waiver on the record. Now, on the issue of excessive sentencing, although there was no firearm enhancement in Louis Pena and Antoine Lacy's case, the court could have exercised its discretion here and reduced his Class X sentence. So you're saying this is a discretionary matter?  However, he could have used that discretion to consider these mitigation factors and reduce his murder sentence without the firearm enhancement to an appropriate level. Well, he still has the firearm enhancement, even if he reduces it, doesn't he? Sure. But he could reduce the sentence to the point where it's reasonable in light of these mitigation factors, even taking into consideration the firearm enhancement. Mr. Morrisey, let me ask you to respond to Mr. Mottese's argument about Dr. New, where he contended the record demonstrates that your client sort of dumbed himself down purposely with the goal of getting a more favorable IQ test. Yes, but that's not what the record says. Dr. New actually says that he specifically did not find any malingering. Malingering would be intentional dumbing down. What Dr. New said is that Raymond, because he has such a low IQ, he gets frustrated in difficult situations and kind of just shuts down, becomes frustrated and shuts down and can't perform to his, maybe to the peak of his abilities due to his, like, extreme frustration. But he did find specifically that there was no malingering. Additionally, on the fact that the court maybe did expressly enumerate various factors in mitigation, like the case in People v. Markowitz, although the court reiterated factors in mitigation, the record here shows they didn't consider them and weigh these factors against the aggravation in this case. I don't understand that argument. If he says he considered it and rejects it, how can you say he didn't consider it? Well, they just don't like the result he came to. No, Your Honor. He may have reiterated these mitigation factors, but he found that virtually no factor in mitigation comes into play in this case, and that is simply not true. As I stated earlier, there is a litany of mitigating factors that this court failed to consider in this case. And finally, Your Honor, the prosecutor said that most teenagers wouldn't do these kind of actions. However, most teenagers don't live in the middle of a gang war on a block controlled by the gang. I love that argument. So it's an excuse to run around and turn our streets into Dodge City merely because of where you live. No, Your Honor. It is not an excuse. But it is something that should have been considered by the court in assessing his moral culpability for these actions. Oh, we're on a slippery slope there, aren't we? Well, a person taking into consideration Raymond was not a member of the gang, has these significant personal and intellectual issues, and is under the threat of violence by the gang that controls his block, certainly are something that can be considered in assessing his moral culpability for his actions. And as Justice Hoffman mentioned a few minutes ago, isn't that the defense of compulsion? That's how it comes in, isn't it? Although it may not have raised to the defense of compulsion here, it's certainly something that could be considered in assessing his moral culpability, if not his guilt for the offense. So if there's no further questions, thank you, Your Honors. Counsel, thank you. The matter will be taken under advisement. The court stands adjourned.